UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

ART AND COOK, INC.,

                Plaintiff,

       -against-

ABRAHAM HABER,

                Defendant.
------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**

17-cv-1634 (LDH) (CLP)

LASHANN DEARCY HALL, United States District Judge:

      Plaintiff Art And Cook, Inc. brings this action against Defendant Abraham Haber,

alleging violations of the Defend Trade Secrets Act ("DTSA"), misappropriation of trade secrets,

breach of fiduciary duty, breach of the duty of loyalty, unfair competition, tortious interference

with prospective advantage, and unjust enrichment.  (*See* Compl., ECF No. 1.)  On March 23,

2017, Plaintiff moved for an order to show cause for a temporary restraining order ("TRO") and

preliminary injunction prohibiting Defendant from: (1) using or disclosing trade secrets or

confidential information taken from Plaintiff; (2) selling to any of the persons or companies

listed on any files or documents Defendant emailed himself or printed out from Plaintiff's

computers or servers; (3) buying from any of the persons or companies listed on any files or

documents Defendant emailed himself or printed out from Plaintiff's computers or servers; (4)

using or disclosing information Defendant developed or worked on using Plaintiff's computers;

(5) using or disclosing information Defendant developed or worked on during the course of his

employment; and (6) using a mark ("Gripps") for commercial purposes in relation to

homeware/kitchenware/cleaning products.  (*See* Order to Show Cause, ECF No. 6.)

At a hearing on March 23, 2017, the Court issued the TRO.[1] (*See* March 23, 2017 Min. Entry.) On April 5, 2017, the Court held an evidentiary hearing on Plaintiff's motion for a preliminary injunction. For the reasons set forth below, the motion was denied. (*See* April 7, 2017 Order.)

## BACKGROUND

Plaintiff is a cookware and kitchenware company that sells its products to a number of large retailers. (Ben Aff. ¶ 3, ECF No. 13; Haber Aff. ¶¶ 5-6, ECF No. 17.) Plaintiff has approximately twenty employees and annual revenues in excess of ten million dollars. (Ben Aff. ¶ 2.) Defendant began working for Plaintiff in 2012. (*Id.* ¶ 4; Haber Aff. ¶ 4.) Until his termination on January 13, 2017, Defendant served as a salesperson and was responsible for other aspects of the business, including sourcing, merchandizing, and design. (*See* Haber Aff. ¶¶ 10-11; Apr. 5, 2017 Order to Show Cause Tr. ("Tr.") 77:4-22.) Defendant was not made to sign a non-disclosure or non-compete agreement—or any restrictive covenant—as a condition of his employment. (*See* Compl. ¶¶ 12-13; Def.'s Mem. 1, ECF No. 16; Tr. 27:24-28:4, 84:8-16.) Plaintiff allegedly asked Defendant to sign an employee handbook and non-disclosure agreement approximately three years into his employment, but Defendant refused to sign them. (*See* Tr. 16:15-23; 84:17-21.)

Prior to Defendant's termination, Plaintiff conducted a search of Defendant's work computer, which revealed that Defendant had emailed certain documents to his personal email account. (*See* Ben Aff. ¶ 6; Tr. 51:6-15.) Plaintiff maintains that these documents are trade

---

[1] As per the Court's March 23, 2017 Order issuing the TRO, Plaintiff was required to post bond in the amount of $6,500. Plaintiff's $6,500 security check, however, which was paid to the Court on March 24, 2017, was ultimately returned as unpaid due to insufficient funds. Accordingly, the TRO was never actually in place. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

secrets.  (*See* Ben Aff. ¶ 6.)  Specifically, on January 4, 2017, a colleague emailed Defendant a spreadsheet containing the names, phone numbers, and email addresses of the buyers for seventy-two companies, some of which were Plaintiff's customers.  (*See* Ben Aff. ¶ 15, Ex. D.) Defendant then forwarded the email with the spreadsheet attached to his personal email account. (*See* Ben Aff. Ex. D.)  In addition, on January 5, 2017, Defendant emailed himself a second spreadsheet containing logos, branding/marketing strategies, target customer lists, and sales projections for an anticipated line of cleaning supplies called "Gripps".  (*See* Ben Aff. ¶ 20, Ex J.)  Finally, at the April 5, 2017 evidentiary hearing, Plaintiff produced a PowerPoint presentation that Defendant allegedly emailed to himself.  (*See* Tr. 22:22-24:21.)  This final document contained a marketing business plan for an anticipated line of cleaning supplies related to "Gripps".  (*See id.*)

Following Defendant's termination, Plaintiff alleges that Defendant contacted the owner of one of Plaintiff's Chinese suppliers, Hope Sun, requesting that he supply Defendant with products similar to those supplied to Plaintiff.  (*See* Ben Aff. ¶ 21.)  Hope Sun did not comply, but instead notified Plaintiff's president, Alon Ben-Ishai,[2] of Defendant's request.  (*See id.*)

## STANDARD FOR A PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)).  To obtain a preliminary injunction, a moving party must show four elements: (1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance

---

[2] Mr. Ben-Ishai filed his affidavit using the shorthanded name "Allen Ben," but clarified during the preliminary injunction hearing that his full name is actually Alon Ben-Ishai.  (*See* Tr. 48:11-49:2.)

of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief. *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 33 (2d Cir. 2015) (summary order) (citing *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).

## DISCUSSION

Although the complaint alleges various claims under both federal and state law, Plaintiff's instant motion is premised exclusively on its claim under the DTSA. (*See* Pl.'s Mem. 2-3, ECF No. 14.) The DTSA expanded the provisions of 18 U.S.C. § 1831 *et seq.*, providing a federal cause of action to the owner of a trade secret that is misappropriated and is related to a product or service used in, or intended for use in, interstate or foreign commerce. *See* Defend Trade Secrets Act of 2016, ch. 90, 130 Stat. 376 (2016) (codified as amended at 18 U.S.C. § 1831 *et seq.*). A trade secret is defined under the DTSA as, *inter alia*, "business information," including "plans," "compilations," and "designs," if (A) "the owner thereof has taken reasonable measures to keep such information secret;" and (B) "the information derives independent economic value . . . from not being generally known . . . [or] readily ascertainable . . . [to] another person who can obtain economic value from the disclosure or use of the information[.]" 18 U.S.C. § 1839(3)(A)-(B). Here, Plaintiff seeks DTSA protection over two categories of material: its customer contact list and its designs and branding/marketing strategies.

## I.     Likelihood of Success on the Merits

### A.     Customer Lists

The Second Circuit, applying New York law, has long recognized that, under certain circumstances, a customer contact list may be deemed a trade secret. Specifically, a customer list "developed by a business through substantial effort and kept in confidence may be treated as

4

a trade secret . . . provided the information it contains is not otherwise readily ascertainable."[3]  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (quoting *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985), *cert. denied*, 474 U.S. 844 (1985)).  That is, the list derives independent economic value from not being generally known.  *Cf.* 18 U.S.C. § 1839(3)(B) (requiring trade secrets under the DTSA to "derive[] independent economic value . . . from not being generally known").  This is particularly true where the customer list contains individual customer preferences or represents the list owner's work to create a market for a new service or good.  *See N. Atl. Instruments, Inc.*, 188 F.3d at 46 ("Numerous cases applying New York law have held that where . . . it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply."); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 393-94, 278 N.E.2d 636, 640 (1972) (discussing *Town & Country House & Home Serv., Inc. v. Newbery*, 3 N.Y.2d 554, 147 N.E.2d 724 (1958), in which the defendant was enjoined from soliciting plaintiff's customers because they had been "screened by respondent at considerable effort and expense, without which their receptivity and willingness to do business with [the plaintiff's] kind of a service organization could not be known").  Where, however, the contact list contains little more than publicly available information, even if it takes considerable effort to compile, it is not accorded protection under the DTSA.  *See Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 566 (S.D.N.Y. 2016) (finding plaintiff's customer list of well-known apparel retailers not to be a trade secret under DTSA or state law because the contact information for the companies was readily ascertainable via phone calls, the internet, and directories of buyers in the apparel

---

[3] This standard, derived from New York state common law, is instructive for deciding the instant motion because of its similarity to the DTSA's definition of a trade secret, which also requires that information be "[kept] . . . secret" (via reasonable measures) and not be "readily ascertainable."  *See* 18 U.S.C. § 1839(3)(A)-(B).

industry); *cf. Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 557-58 (E.D.N.Y. 1995) (finding customer list of retail merchants not to be a trade secret under state law where the customers were "openly engaged in business and known generally in the trade"); *see also Kadant, Inc. v. Seeley Mach., Inc*., 244 F. Supp. 2d 19, 36 (N.D.N.Y. 2003) (finding specific names of individuals key to the purchasing chain of command not to be a trade secret under state law where customer companies' general contact information was readily available and "follow-up questions to the company in general would reveal the specific names, e-mail addresses, or phone numbers of individuals involved in the purchasing process").

The contact lists at issue in this case contain buyer information for approximately seventy-two companies. Notably, many of the companies on Plaintiff's lists cannot fairly be called customers. Mr. Ben-Ishai admitted during testimony that a number of the companies on the lists are companies to whom Plaintiff is merely "trying to sell." (*See* Tr. 78:12-79:10.) Even where the company is a customer, the lists do not include information, such as customer preferences, that would be difficult to duplicate. To the contrary, the lists are little more than a compilation of publically available information: emails and phone numbers for buyers at well-known retailers whose identities are not protected. (*See* Ben Aff. Exs. D, J.) Indeed, Mr. Ben-Ishai testified that the contacts on Plaintiff's customer lists are generally known in the industry and may be obtained by hiring representatives, attending trade shows, and meeting buyers from various companies. (*See* Tr. 86:9-18, 87:9-23.) He also acknowledged that a portion of the contacts on the lists could be found using simple internet searches. (*See* Tr. 86:4-10.). That the compilation of these lists may be an arduous task, involving "tens if not hundreds of hours" of research (Ben Aff. ¶ 15), is not alone sufficient to confer protection under the DTSA. *Cf. Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1044-45 (S.D.N.Y. 1987) (finding a

6

customer list of prospective customers "put together from easily available sources" may not have constituted a trade secret despite the fact that "considerable work [went] into compilation of the list, which include[d] some 10,000 names").

The fact that the contacts on Plaintiff's customer lists are generally known within Plaintiff's industry is fatal. Simply put, knowledge that is generally known within an industry cannot be said to constitute the trade secret of one industry participant. Accordingly, Plaintiff's customer lists are not trade secrets under the DTSA. As such, Plaintiff has failed to demonstrate a likelihood of success on the merits as to its customer lists.

#### B. Designs and Branding/Marketing Strategies

Unlike the customer lists, the designs and branding/marketing strategies developed in connection with the "Gripps" brand are the sort of business information that the DTSA was designed to protect: they derive independent economic value from not being generally known. In order to prevail on this motion, however, Plaintiff must not only show that the information derives independent economic value from not being generally known, it must show that it took "reasonable measures" to keep the information secret. *See* 18 U.S.C. § 1839(3)(A).

Here, Mr. Ben-Ishai testified that Plaintiff utilized some protective measures to safeguard its business information. For example, Mr. Ben-Ishai stated that he spoke to Defendant many times about confidentiality, and Plaintiff allegedly asked Defendant to sign an employee handbook and non-disclosure agreement two years before Defendant's termination, though Defendant refused to sign them. (*See* Tr. 16:15-23, 62:2-4.) The Court struggles to find that these efforts constitute "reasonable measures" to protect valuable trade secrets. Tellingly, Plaintiff did not ask Defendant to sign the employee handbook and non-disclosure agreement until three years into his employment. (*See* Tr. 16:15-23.) Furthermore, when Defendant

refused to sign either document, Plaintiff nonetheless gave him access to what it contends is valuable and confidential information.[4]  (*See* Tr. 16:24-17:25, 62:10-15, 82:19-25.)  According to Mr. Ben-Ishai, Plaintiff's failure to take this imminently reasonable measure to protect its information was not limited to Defendant.  Rather, all of Plaintiff's employees refused to sign the handbooks and/or non-disclosure agreements.  (*See* Tr. 81:14-20; 84:8-23.)  Yet, their access to Plaintiff's information was not limited accordingly.  (*See* Tr. 81:16-82:2; 84:8-23.)

The Court recognizes that Plaintiff took other steps to secure its information, such as utilizing a password-protected server, password-protected folders, and a third-party internet security company to protect its servers from outside hacking.  (*See* Tr. 53:14-25, 57:11-58:16, 60:18-23.)  These measures certainly provide an argument that Plaintiff took reasonable measures to protect its purported trade secrets such that they should be afforded DTSA protection.  However, absent more—and in the face of the failings discussed above—the Court cannot conclude that Plaintiff is *likely to succeed* on any such argument.  *Cf. Wrap-N-Pack, Inc. v. Eisenberg*, No. 04-cv-4887, 2007 WL 952069, at *9 (E.D.N.Y. Mar. 29, 2007) (finding that the plaintiff implemented "significant safeguards" to protect trade secret information and conferring trade secret protection under New York state law where the plaintiff utilized not only password-protection, but also restrictive covenants, an employee manual with confidentiality provisions, litigation to prevent disclosure of confidential information, and memoranda concerning confidentiality); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15-cv-211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (finding the owner of a trade secret to have taken reasonable measures to keep the information secret under the DTSA where

---

[4] Plaintiff has not produced its employee handbook or the non-disclosure agreement that it maintains it asked Defendant—along with all of its other employees, (*see* Tr. 80:7-14)—to sign two years before Defendant's termination.

the owner utilized "strictly controlled servers" *and* "confidentiality provisions and limitations"). Accordingly, Plaintiff has failed to demonstrate a likelihood of success on the merits with regard to its designs and branding/marketing strategies.[5]

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is DENIED. Furthermore, given the lack of a likelihood of success on the merits as to the DTSA claim, Plaintiff's only federal cause of action may be susceptible to a motion to dismiss. Plaintiff's state claims, however, may persist—particularly those claims related to the duty of loyalty, which requires neither the existence of a restrictive covenant nor the misappropriation of a trade secret.

Dated: Brooklyn, New York
      October 3, 2017

SO ORDERED:

_____/s/LDH_____

LaSHANN DeARCY HALL
United States District Judge

---

[5] Plaintiff has similarly failed to demonstrate irreparable harm. As discussed above, the only trade secrets Defendant could arguably be said to have misappropriated are Plaintiff's designs and branding/marketing strategies developed in connection with the "Gripps" brand. Because Defendant is starting his own business, the reasonable inference is that he would have wanted the "Gripps" designs and strategies for his own purposes. Indeed, Plaintiff has not alleged that Defendant has or will disseminate the information to any of Plaintiff's competitors, as doing so would impair its value for Defendant in connection with his own venture. Irreparable harm thus could not be presumed in this case. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009) ("A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury.") Put differently, "where there is no danger that a misappropriator will disseminate proprietary information, 'the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages." *Id.* (citation omitted). Plaintiff has thus failed to demonstrate "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (quotation marks and citation omitted).